**Opinion issued April 22, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-20-00298-CV

———————————

**MAGED GABRA, Appellant**

**V.**

**VIOLA GABRA, Appellee**

---

**On Appeal from the 51st District Court**
**Tom Green County, Texas**
**Trial Court Case No. A-19-0060-F**

---

## MEMORANDUM OPINION

In this divorce proceeding, appellant, Maged Gabra, appeals from the trial court's divorce decree. In two issues on appeal, Maged argues that the trial court (1) abused its discretion in denying his motion for a continuance and (2) erred in finding a history or pattern of family violence.

We affirm.

## Background

Appellee, Viola Gabra, and Maged married in 2009 and have three children, A.G., C.G., and T.G. After moving with her children from California to Texas for a job, Viola filed for divorce in Tom Green County[1] on February 4, 2019. Viola's petition sought to be named as the sole managing conservator, and she alleged that Maged engaged in a history or pattern of family violence.

At a temporary-orders hearing on February 22, 2019, Maged appeared pro se and Viola appeared with her attorney. Viola stated that the parties had reached an agreement on temporary orders, and Maged stated that he understood the terms of the agreement. After Maged gave the trial court a history of the facts leading up to the hearing and that he was in debt, the trial court directed him to sit down and explained that she had to enter temporary orders so that he could have visitation with his children.

Later during the hearing, the trial court stated to Maged, "[i]f you're able to hire a lawyer, it would certainly be helpful for you to present your side to the Court, if you're able to hire a lawyer." At another time, the trial court stated, "[i]f

---

[1] The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas to this Court pursuant to its docket equalization powers. *See* TEX. GOV'T CODE § 73.001 ("The supreme court may order cases transferred from one court of appeals to another at any time that, in the opinion of the supreme court, there is good cause for the transfer."). We are unaware of any conflict between the precedent of the Third Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

you've got evidence that you want to present, you need to hire yourself a lawyer, because that lawyer can help you know how to get the testimony in and how to get documents into evidence." At another point in the hearing, after Maged tried to give the trial court his written response, the trial court told Maged, "[i]f you get yourself a lawyer, your lawyer will need those papers. Your lawyer will also need a copy of whatever answer you have." Maged responded, "For the lawyer—she has the money. She has all the savings for all of my life, since we get married and before the marriage; and then she—She has the power. I don't have the power." After Viola's counsel objected to Maged's discussions with the trial court, Maged stated, "She has got the money, Your Honor. I don't have the money to hire an attorney." The trial court explained that it was only ruling on child support and possession and that Maged had the "ability to come back into court and make requests with regard to other assets." The trial court continued,

> [Y]ou would be well-served to have an attorney who could assist you in doing that. There are many lawyers here in San Angelo who can assist you in doing that. I can't tell you who to go to, but there are many who do this type of law and they can help you present your case in a way that I am permitted to hear it. I am unfortunately not permitted to just sit here and hear information. I can't do anything with that.

At the conclusion of the hearing, the trial court stated, "I strongly encourage you to locate an attorney to represent you. All right?" Maged responded, "Okay."

At the final hearing on September 11, 2019, Viola appeared with counsel, but Maged appeared pro-se. Viola's counsel explained to the trial court that she spoke with Maged that day and that he told her that he had hired an attorney who could not be present on that day. Viola's counsel then stated that she phoned the attorney that Maged named, Chris Flores, who informed her that "he ha[d] not been hired, that he met with Mr. Gabra yesterday. Mr. Gabra was trying to hire him and [Flores] said, 'Your trial is tomorrow'" and "'I'm not taking this on.'" Viola's counsel stated that they were ready to proceed.

After the trial court asked for Maged's opening statement, the following transpired:

Gabra: I need time to hire attorney. I already talked to Mr. Flores, and Mr. Flores he had until next Monday a trial and he can't even make it; and he told me to explain to the Court exactly, because the kids—the two weeks—not last Thursday. The Thursday before—

Court: I don't want you to go—I don't want you to go into evidence. Now, let me tell you on the issue with your attorney, because I know—I know you filed a Motion for Continuance,[2] which the Court did not grant—

---

[2] The trial court appeared to be referring to a letter Maged sent before trial which asked if the final hearing could occur in October 2019 to correspond with his visitation schedule with his children. Maged's letter is not within the appellate record but included in an appendix to Maged's brief. *See WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 465 n.23 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) ("We cannot consider documents attached as appendices to briefs and must consider a case based solely upon the record filed."); *see also* TEX. R. APP. P. 34.1 (appellate record consists of the clerk's record and, if necessary to the appeal, the reporter's record);

4

| Maged: | Yes. |
|---|---|
| Court: | —because you didn't want to come out here for this, but you have known about the issues that would be involved in this case for months now, since—I was the judge on the temporary orders and you have known about that, so you have had ample time to hire an attorney. You have had—even just to make a phone call and start hiring an attorney out here. So we are going to go ahead and move today. I need to get to where we start hearing evidence. You will have an opportunity to present your case— |
| Maged: | Your— |
| Court: | Sir, I am telling you you will have an opportunity to present your case. I asked for just a short summation so I knew your position. I think I understand your position, that you want to see your children and that you think this process has not been fair and you are concerned about the property division; and we will get into all of that in evidence once you are actually under oath. So I am going to ask you to take a seat and I am going to let Ms. Skinner call her first witness. |

Viola called Mollie Laqua, a counselor at the Concho Valley Biblical Counseling Center, who testified that she had been seeing Viola and Maged's three children since January 2019. When she first started seeing the children, Laqua saw aggression, anger, and some depression. She thought the youngest child, T.G., did not have aggression compared to the others. She testified that A.G. admitted to yelling and putting her hands on her brothers at times. Since she started working with the children, she has seen a "night and day" difference. She said that A.G. is hurt that her Father is sad.

5

Laqua expressed concerns with Maged's contact and communication with his children. She explained, "These children have never said an unkind word against their father, never. Nor have we to them. But in roundabout questioning with [A.G.'s] anger and where it could lead, she worries that the police could be called. Those kind of things worry her. That just concerned me." Laqua also explained that A.G. believed that if she did not control her anger, the worst thing that could happen is that the police would be called and "they would take [her] to jail." Laqua said that A.G.'s language indicated to her that she knew about "that." Laqua agreed that A.G. had been very careful about making accusations and could not easily disclose "those things." Laqua clarified that A.G.'s anger issues were a learned activity and that when she asked A.G. what scared her, A.G. responded "Daddy's yelling."

Laqua also testified that "[t]he conversations with Mom and Dad get heated" and "[t]hose kind of things scare [A.G.]." When asked if A.G. had ever described what her outbursts are like, Laqua responded that A.G.'s exact words were "I have anger issues like my dad." Laqua testified that A.G. described the anger issues as "yelling, throwing things. She never mentioned any physical contact, but she quickly—That conversation [was] done." Laqua agreed that it was difficult to have a long, in-depth exploration of the anger issues with A.G. Laqua also had

6

concerns about adult things being said to the children and that Viola had gotten the kids back to "happy-go-lucky-kids instead of worriers.

On cross-examination, Laqua agreed that the children knew how much their Father loved them. She also testified that the children spoke about seeing their Father and had never said anything negative against him. When asked if she had fears of the children being close to Maged, Laqua responded, "yes" and she thought that the visitations needed to be supervised. She explained, "One thing [A.G.] has shared is that when you are together, whether it's in a store or whatever, it still gets loud. It still gets uncomfortable between Mom and Dad, and she gets protective of Mom and has admitted to going over and hanging up the phone just so the yelling would stop." When asked who A.G. hung up the phone with, Laqua responded, "[A.G.] says, 'That's enough, Daddy,' if you're yelling or if you're raising your voice, what she calls yelling. If you're raising your voice."

After questioning Laqua, Viola offered petitioner's exhibit 1, a 2015 certified copy of a California restraining order. Over Maged's age-related objection, the trial court admitted the exhibit. In explaining the restraining order, Viola testified that she had experienced an incident of violence against her by Maged in 2015, the police were called, and Maged was arrested for assault. Viola testified that the children were home at the time and that she later received a restraining and protective order against Maged.

After the trial court admitted a police report over Maged's objection, Maged stated, "I don't under—Your Honor, that's why I need my attorney, because there's a lot of things I don't know." The trial court responded, "And as I recall, at the temporary orders I advised you that you would be wise to hire an attorney; but we are now months later—Don't talk over me. We are now months later and you chose not to hire an attorney, for whatever reason. And so this hearing is set. We are proceeding, and so your request for a continuance to hire an attorney has been overruled by this Court."

Viola's testimony continued and she recalled that A.G. visited a pediatrician in 2018 for severe pain in her wrist and scratches on her back. The pediatrician's medical report stated,

> [Patient] complaining of right wrist for past 3d and has had back pain as well that is now improved. [Patient] stated that her father was angry at her and grabbed her hard by the wrists and pushed her to the ground. He also hit her in the back. [Patient] told her mom, who took picture of red marks on her back. [Patient's] grandmother wrapped [Patient's] wrist with cloth to help with pain. [Patient] has been able to move her wrist, but has pain when she puts pressure on the outstretched hand.
>
> Per mom, family has history of domestic violence. Father was arrested in 2014 for domestic violence and went thru anger management classes. She had a restraining order against him for 3 months, but he was allowed to live back in the home in early 2015. Aggression and anger apparently common occurrences at home though this episode became more aggressive—

8

The report also states under the "Assessment" heading, "Victim of Child abuse–Pt with wrist sprain due to maltreatment by father. Mother also has photos documenting red marks on skin after child hit by father. CPS report filed with Luz Rodriguez."

When asked if it was important for Maged to have supervised visits, Viola testified, "It's important that they would continue supervised." Viola disagreed that it would be in the children's best interest for their emotional or physical welfare to have access or unsupervised possession with their father. Viola testified that she was afraid for her children.

On cross-examination, Maged asked Viola why she did not call the police if he abused A.G. Viola responded,

> Because I was afraid of more anger and retaliation. because I was afraid for my kids because you had no control over your anger issues. Because I was praying hard that God would open the door somewhere; and then this job in Texas opened up, and by that—by that time I knew that I was moving, and I didn't want to start the case in California and then have to follow up—follow from long distance.

When Maged asked, "What kind of fear I did to you to provoke you to pick up the phone, for the police," Viola responded,

> We have a history of domestic violence. You are very abusive and manipulative. You basically make my life hell, and the last time I called the police you put it on the kids that you—you told the kids, 'Look, this is your mom. She called the police on your dad. I lost my future. She ruined my future.' And [A.G.], each time we had a heated discussion she would hang onto my

9

legs and say, 'Mom. Mom. Mom, calm down. You don't need to call the police. Mom.'

Viola recalled an occasion when "[i]n a heated discussion when you almost physically attacked me I picked up the phone and my mom said, 'Calm down. Calm down. There's no need to call the police. Calm down. Calm down. Just go somewhere else. Just go upstairs.' Just something like that."

Viola also testified, "When you yell and when you move your hand in my face, when you jump and shake, when you run upstairs and then come back down yelling and screaming, when you push the kids against the furniture, that's yelling and screaming." In addition to the incident with A.G.'s back, Viola recalled another incident involving C.G., who was pushed against a glass, wood, and steel table that caused scratches to his back. Viola testified that the incident occurred during the Christmas before she moved, and she reported it to the police.

A police report of the incident from December 2017 explained that while Maged placed a chair on its side to vacuum the floor, the children began climbing on the chair and Maged became angry. The report continued,

> [Viola] said the children would not listen to Maged's orders to stop playing on the chair, so he pushed [A.G.] and [C.G.] away from the chair. When he pushed [C.G.] away from the chair, he was forced into a nearby table where he hit his back against it.
>
> Viola stated she does not believe it was Maged's intention to push [C.G.] into the table, but she became fearful since he becomes angered so easily. [C.G] received a small red mark

10

(abrasion) on his back from the impact with the table. I observed this injury in photographs Viola had provided to me.

. . .

Viola stated Maged has not been physically violent to the family but sometimes pushes her when he is upset and loses his temper. She said he resents her for putting him in jail for the domestic violence incident in 2015.

When Maged asked Viola if she had any enemies at work that caused her to want to move to Texas, Viola responded, "I have a big reason to move to Texas, to keep my kids away from violence, from the domestic violence, from emotional abuse. That was a godsend opportunity for me to protect my kids."

When asked why Viola did not call the police when he abused the kids in San Angelo, Viola responded, "Because the abuse didn't happen in San Angelo. It happened in Monterey, California" and it had "been happening for years." Viola also testified,

I moved to Texas to keep the kids safe from the physical and verbal abuse. However, I was willing to remain in marriage as long as we are separated like this, because I feared for my kids. But during your visitations, during being here, you've been mentally and physically—not physically. Mentally and verbally abusing me and the kids as well, so I had to put an end to it. You—we had several discussions that this is not healthy. This is not going right. This is—I can't take this abuse anymore. And you didn't learn. You didn't adhere to what I have been saying, so I had to proceed."

During his cross-examination of Viola, Maged stated again, "I'm a poor guy now. I don't have attorney. I have to get attorney." And he stated, "[I]f we do it, I

11

have to get my attorney or I lose my—I am going to lose my kids." After a recess, the following transpired:

> Maged: I want to let the Court know again and again, I have to have an attorney, because this case, it will be—It will be hurting for the kids all their lives and for me and to—to take the kids away, this penalty—to give me this penalty, Judge—Don't take these kids away from me.
>
> Court: I understand that this case has been set for an extended period of time for trial; and it was your choice to not retain an attorney and so we are going to move forward with the hearing today, sir.
>
> Maged: No, Your Honor. Because—Because my wife, she left— She left me and she wiped me out.
>
> Court: No, sir.
>
> Maged: She left and—
>
> Court: No, sir. Do not argue with me.
>
> Maged: There is one hundred thousand dollars that she took—
>
> Court: No, sir. No, sir. Do not argue with me.

The hearing continued and Maged asked if Viola filed for divorce because of adultery. Viola responded, "I didn't file for divorce because you committed adultery. I filed for divorce because you were violent with the kids and for domestic violence." She clarified, "I filed for divorce because you had issues with anger and with domestic violence. I was scared for my kids, and that was the reason. That was the main reason for me filing for divorce." When asked what he

12

did to the kids, Viola responded, "You hit the kids. You yell at them. You are not a good role model. You lie in front of them. You yell all the time. You have no control over your anger. You hide food from them" and "when your daughter sees the food that you're hiding you hit her." When Maged asked her to explain the hiding of food, Viola testified,

> You purchased three pieces of pastry. You hid them in the toaster oven, and when [A.G.] looked for them you punished her because she was not behaving. You told her that she is not getting the pastry, even though that she loves it. And when she was able to find it and she ate one piece, you hit her and you lost your control. You hit her and you pushed her to the ground; and when she didn't like that, when she started to stand up for herself, you hit her on her back with a plastic stick, her brother's toy, a toy that the brothers had.

While questioning Viola, the following exchange transpired:

Maged:    Your Honor, I don't want to waste your court—your court time. Your Honor—Your Honor, I still—I still need my attorney, yes.

Court:    Sir, I understand.

Maged:    Yes.

Court:    But the problem is that you did not hire one and we are set for final hearing.

Maged:    I was—

Court:    Sir, please, it's been a long day. Do not argue with me. I'm not going to tolerate it.

Maged:    I'm sorry.

13

Court:      I have tried to be polite.  I have tried to be respectful of you.  I'm not going to tolerate you arguing with me when I am already keeping significant numbers of courthouse personnel here late in order to have your case heard, since you've flown in from California for this.  Now, you did not hire an attorney.  This matter has been set for trial since May.  You had temporary orders in February.  You have had seven months and more than that if you factored in when you were served with the petition.  The case is being heard today, period.

Maged:      Your Honor, that's why the Court—She doesn't know the reason why I don't have attorney.  It's because my wife she left me with a whole bunch of money credit and I have to pay all this month—all this money.  And also, when she—When she buys the house, the last penny, she take it from me.  We spent—I spent fifteen thousand dollars—

Court:      Sir, you'll have an opportunity to present your case, although you're running out of time, because I have a chess clock running up here.  So you're running out of time to present the evidence that you want to present.  So, if you have other questions for your wife, please ask her the questions.  If you don't have any more questions, we'll see if Ms. Skinner has any more questions or not.

Maged:      Your Honor—Your Honor, I don't have no questions for her; but I'm asking the Court again—Again, I need to—For the benefit for my kids and for the—

Court:      Your request for continuance mid trial is—

Maged:      Yes.  I—

Court:      It is overruled.

Maged then stated he had no further questions and Viola rested.

14

In presenting his case-in-chief, Maged testified in narrative form that Viola was lying and that he did not commit adultery. Regarding A.G., Maged testified that she has eczema, he did not hurt his daughter or push her on the hand, and that A.G. is allergic to wheat. Maged claimed that Viola stole over $100,000 of his money, that Viola brainwashes the kids, and that he has "no money, because she wiped [him] out." Maged claimed that Viola had abused him because she got the kids, she got the house, and she took all of the money. Maged mentioned an incident that happened between him and Viola but that it was "nothing violent, God knows" and that "she called the cops."[3] Maged said that he did everything for the kids and he testified, "I'm not abuser. I'm not violent. I'm decent dad. I'm not perfect, but I'm not crazy like the way she described me. I'm not crazy. I'm not violent. I don't hurt my kids. I love them. I give them everything."

In closing argument, Viola asked to be named sole managing conservator, asserted that Maged had only visited once since the temporary orders, and contended that she was already making all of the decisions for the kids. At the end of closing arguments, the trial court stated that the temporary orders would remain in effect for child support and supervised visitation.[4]

---

[3]     Maged's testimony appears to refer to the 2015 domestic-violence incident that resulted in his arrest and the issuance of a restraining and protective order.

[4]     On September 26, 2019, the trial court issued an initial letter ruling, finding a history of family violence by Maged and that naming Viola as sole managing

15

On January 21, 2020, the trial court issued its Final Decree of Divorce, appointing Viola as the sole managing conservator of the children, appointing Maged as possessory conservator, finding that credible evidence showed a history or pattern of family violence committed by Maged, and requiring Maged to complete a batterer's intervention and prevention program.[5] Once he completed the program, Maged could have telephone and supervised visitation access with his children.

On February 20, 2020, Maged filed a motion for new trial, asserting,

(1)     Irregularity in the proceedings of the court, by which such party was prevented from having a fair trial, Movant requested a continuance for the purpose of retaining legal counsel. The Court denied this Motion because it was made orally and not in writing and the Court stated Movant had sufficient time to obtain a lawyer. This Motion was denied even though it was the first setting for this case. This denial of a first request for a continuance kept Movant from presenting his position to the Court and resulted in rulings that have the effect of cutting off contact with his children and curtailed his ability to present evidence pertaining to property and child support.

(2)     That substantial justice has not been done[.] The ruling of the Court tramples on Movant's right to have significant access to his children, which is a fundamental right. There is no ground

---

conservator would be in the children's best interest. Maged, now represented by counsel, responded by filing, on October 31, 2019, a "Motion to Reconsider Trial," arguing that the trial court erred in not granting his continuance and that substantial justice had not been done.

[5]     *See* TEX. FAM. CODE § 153.004(d-1)(2)(D) (permitting trial court to require parent to attend and complete battering intervention and prevention program).

for basically severing the parent-child relationship by denying him meaningful access to his children.

(3) That the division of property was not just and equitable.

On April 7, 2020, at the hearing on the motion for new trial, Viola argued that Maged's amended motion for new trial, which had been filed that morning, was untimely and that Maged was thus limited to arguing the points originally raised in his February motion for new trial. The trial court sustained Viola's objection and ruled that Maged could only argue the points raised in the motions for new trial filed on October 31, 2019 and February 20, 2020.

During the hearing, Maged's counsel argued that the trial court denied the motion for continuance because it was not in writing and that the trial court should have considered the circumstances of why Maged could not get counsel, which is that Viola absconded with the funds. Maged's counsel asserted that if the trial court would have granted the continuance for 30, 60, or 90 days, Maged would then have had representation. The trial court stated that she understood Maged's position to be that the motion for continuance should have been granted and that because it was not, he was denied an opportunity for a fair trial.

Maged's counsel next argued that the trial court's ruling in the final decree constituted a termination of Maged's parental rights and that there was no family violence. Maged's counsel contended that when A.G. ate the pastry, Maged

17

exercised reasonable parental control and that Viola manufactured that into family violence.

Viola's counsel responded that Maged sent a letter to the trial court in August 2019 and did not mention having trouble finding counsel. Viola's counsel further argued that Maged's parental rights were not terminated and while Maged has certain things he needed to do, he had chosen not to do them.

On May 7, 2020, the trial court denied the motion for new trial. Maged timely filed a notice of appeal.

## Motion for Continuance

In his first issue, Maged argues that the trial court abused its discretion in denying his pro se motion for continuance to obtain legal counsel.

### Standard of Review

We review a trial court's denial of a motion for continuance for an abuse of discretion. *See State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988). A trial court abuses its discretion when it acts unreasonably or arbitrarily, or without reference to any guiding rules or principles. *Barras v. Barras*, 396 S.W.3d 154, 164 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). We may not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *See Bowie*

18

*Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Zagorski v. Zagorski*, 116 S.W.3d 309, 313–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

A continuance may not be granted "except for sufficient cause supported by affidavit." TEX. R. CIV. P. 251. In civil cases in which the absence of counsel has been urged as a ground for continuance, courts generally require a showing that the failure to be represented at trial was not due to the party's own fault or negligence. *See State v. Crank*, 666 S.W.2d 91, 94 (Tex. 1984); *In re S.L.L.*, No. 09–09–00429–CV, 2011 WL 1224983, at *1 (Tex. App.—Beaumont Mar. 31, 2011, pet. denied) (mem. op.); *see also* TEX. R. CIV. P. 253 ("[A]bsence of counsel will not be good cause for a continuance or postponement of the cause when called for trial, except it be allowed in the discretion of the court, upon cause shown or upon matters within the knowledge or information of the judge to be stated on the record.").

**Analysis**

At the February 22, 2019 temporary-orders hearing, the trial court admonished Maged to retain counsel on numerous occasions. Maged stated that he understood that he needed to get counsel. Specifically, at the temporary-orders hearing, the trial court informed Maged of the following:

- If you're able to hire a lawyer, it would certainly be helpful for you to present your side to the Court, if you're able to hire a lawyer.

19

- If you've got evidence that you want to present, you need to hire yourself a lawyer, because that lawyer can help you know how to get the testimony in and how to get documents into evidence.

- If you get yourself a lawyer, your lawyer will need those papers. Your lawyer will also need a copy of whatever answer you have.

- [Y]ou would be well-served to have an attorney who could assist you in doing that. There are many lawyers here in San Angelo who can assist you in doing that. I can't tell you who to go to, but there are many who do this type of law and they can help you present your case in a way that I am permitted to hear it. I am unfortunately not permitted to just sit here and hear information. I can't do anything with that.

- I strongly encourage you to locate an attorney to represent you.

Despite the trial court's numerous admonishments, the record reflects that Maged waited until the day before trial to seek counsel. Specifically, at the beginning of the final hearing, Viola's counsel stated that she spoke with the attorney who Maged apparently had hired to represent him. Viola told the trial court that the attorney told her that he had met with Maged the day before and that he had refused to represent Maged.

Nevertheless, Maged argues that *McMeekin v. McMeekin*, No. 02-05-00118-CV, 2006 WL 820399 (Tex. App.—Fort Worth Mar. 30, 2006, no pet.) (mem. op.) is dispositive of the issue in this appeal. In *McMeekin*, the plaintiff sought a judgment against a defendant who was incarcerated in Arizona. *Id.* at *1. Within 30 days of getting served with the suit, the defendant filed a motion for a 30-day continuance to obtain counsel. *Id.* On the day of the hearing which occurred three

20

days after asking for the first continuance, the defendant filed another pro se motion for continuance to seek counsel. *Id.* The trial court denied the requests and entered a default judgment. *Id.*

The court of appeals noted that the defendant was given 28 days to retain counsel or appear pro se and that he filed three requests for continuance. *Id.* at *2. Although not entirely clear, the court of appeals appears to conclude that the trial court abused its discretion in denying the motion for continuance because the defendant was incarcerated and his presence at trial was beyond his control. *Id.* at *3. The court of appeals also cited and emphasized the local rules of Denton County that "[t]he first continuance and/or first pass *shall be granted* on or prior to announcement day *without necessity of showing cause*, *subject to approval by the trial judge*." *Id.* at *2.

We disagree that *McMeekin* is dispositive of Maged's issue in this appeal. Unlike *McMeekin*, Maged neither filed motions for continuance to obtain counsel prior to trial, nor was Maged incarcerated. Most importantly, Maged had over six months to obtain counsel, and he waited until the day before trial to attempt to obtain counsel.[6]

---

[6]    Maged argues that in *McKeekin*, the defendant had "several weeks prior notice of the hearing date—just as your Appellant did here." As noted previously, the trial court admonished Maged to obtain counsel in February 2019 and the final hearing did not occur until September 2019. Thus, Maged had significantly more time than several weeks' prior notice.

Maged also complains that the trial court did not have enough information to rule on the request for continuance and that the trial court did not permit him to present "any relevant, material testimony or evidence in support of his need for a brief continuance."[7] We disagree. When the trial court overruled his request for a continuance, the trial court had already informed Maged multiple times to obtain counsel during the temporary-orders hearing. During the nearly seven months following the temporary-orders hearing, Maged never filed a motion for continuance to obtain counsel or any type of request to seek payment of attorney's fees to hire counsel.[8] Once the final hearing began and Maged appeared pro-se, Viola's counsel informed the trial court that Maged had attempted to hire an attorney the day before trial, but the attorney refused to represent Maged. Maged was then given another opportunity to inform the trial court why he had not obtained counsel. Despite his opportunity to explain why he needed a continuance, Maged did not explain how the failure to be represented by counsel was not due to his own fault or negligence. *See Crank*, 666 S.W.2d at 94.

---

[7] Maged has not identified, either at trial, in his motion for new trial, or on appeal, any specific evidence that he was precluded from presenting to the trial court in support of his request for continuance.

[8] *See* TEX. FAM. CODE § 105.001 (providing that court may make temporary order for payment of reasonable attorney's fees and expenses).

Considering that the trial court had informed Maged to obtain counsel at the temporary-orders hearing nearly seven months earlier and that Maged waited until the day before trial to contact an attorney, we cannot conclude that the trial court abused its discretion in denying his motion for continuance. *See id.*; *In re S.L.L.*, 2011 WL 1224983, at *1 (concluding that trial court did not abuse discretion in denying pro-se motion for continuance to obtain attorney that was not supported by affidavit, filed two days before hearing, and noting that there was no statement of efforts made to obtain counsel and that trial court "could reasonably conclude that [party] did not carry her burden of showing that the delay in obtaining counsel was not her fault"); *Smith v. McKinney Hous. Auth.*, No. 05–08–01466–CV, 2010 WL 3529524, at *2 (Tex. App.—Dallas Sept. 13, 2010, no pet.) (mem. op.) (holding reasonable trial judge could conclude appellant did not carry burden to show sufficient cause for continuance where appellant made only a couple of attempts to find counsel during the period between date of service of process and trial); *Gillie v. Boulas*, 65 S.W.3d 219, 223 (Tex. App.—Dallas 2001, pet. denied) (holding trial court did not abuse its discretion by denying motion for continuance based on lack of counsel when party had been given almost four months to retain new counsel prior to trial); *see also* Tex. R. Civ. P. 253.

Within the same issue, Maged also asserts that the trial court's discretion was limited by constitutional due process and that his constitutional rights were

23

violated because the trial court denied his motion for continuance. Maged did not raise a constitutional complaint at trial and likewise did not raise it in his motion for new trial after he retained counsel.[9]

Constitutional claims must be raised below or they are not preserved for appellate review. *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003); *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (holding that alleged biological father who sought to establish paternity waived constitutional error, though it was undisputed that father had received no notice or hearing on prior paternity adjudication that created bar); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (holding that appellant's constitutional claim was not asserted in trial court and therefore could not be raised on appeal). Under the rules of appellate procedure, a party must present to the trial court a timely request, motion, or objection, state the specific grounds, and obtain a ruling. TEX. R. APP. P. 33.1; *Rittenhouse v. Sabine Valley Ctr. Found., Inc.*, 161 S.W.3d 157, 166 (Tex. App.—Texarkana 2005, no pet.); *see also Graves v. Alders*, 132 S.W.3d 12, 16 (Tex. App.—Beaumont 2004, pet. denied) (holding appellant waived claim that trial court violated due process rights by denying continuance to complete

---

[9] Maged apparently raised constitutional arguments in his amended motion for new trial filed on the morning of the motion for new trial hearing. However, the trial court ruled that the amended motion was untimely, and Maged does not assign error to that ruling. *See Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 782 (Tex. 2020) ("A court of appeals may not reverse a trial court judgment on a ground not raised.")

discovery). By failing to raise his constitutional issues in the trial court, Maged failed to preserve this issue. *See* TEX. R. APP. P. 33.1.

We overrule Maged's first issue.[10]

## Family-Violence Finding

In his second issue, Maged argues that the trial court erred in finding a history of family violence, which led to improper best interest conclusions, visitation decisions, communication and contact rulings and the trial court's order that Maged attend "a year-long obedience training school before he could have any contact with his children whatsoever." Maged asserts that the trial court's rulings were the "functional equivalent of a termination of [Maged's] rights."[11]

---

[10] Maged also argues in his first issue that the trial court erroneously denied his motion because it was not in writing. Maged's assertion relies on a docket-sheet notation which states, "09/11/2019 [Viola] present w/J Skinner; [Maged] present pro se. [Maged] requested continuance to have time to hire atty—overruled b/c not in writing and sufficient time to retain counsel since April 2019." The record from the final hearing, however, does not indicate that the trial court denied Maged's request for continuance because it was not in writing or supported by affidavit. *See* TEX. R. CIV. P. 251. Because the trial court could deny the request for continuance based on Maged's failure to explain why the absence of counsel at trial was not due to his fault or negligence, it is unnecessary to address Maged's argument that the trial court erroneously denied his request for continuance because it was not in writing. *See* TEX. R. APP. P. 47.1.

[11] Although Maged contends that the trial court's divorce decree has effectively terminated his parental rights and deprived him of any involvement in his children's lives, Maged has not provided any authority that the trial court's divorce decree terminated his parental rights. We further note that the divorce decree permitted Maged to have visitation with his children once he completes a batterer's intervention and prevention program. Moreover, the decree is subject to possible modification in the future. *See* TEX. FAM. CODE § 156.001 ("A court

25

**Standard of Review and Applicable Law**

Conservatorship determinations made after a bench trial are "subject to review only for abuse of discretion." *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). A trial court abuses its discretion if it acts arbitrarily or unreasonably, without reference to guiding rules or principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error, but rather are relevant factors in assessing whether the trial court abused its discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). We consider whether the trial court had sufficient information upon which to exercise its discretion and whether it erred in its application of discretion. *Id*. A trial court does not abuse its discretion if it bases its decisions on conflicting evidence or so long as there is some evidence of substantive and probative character to support the trial court's decision. *Id*.; *see also In re C.A.M.M.*, 243 S.W.3d 211, 214 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

When no findings of fact or conclusions of law are requested or filed, as here, we imply all facts necessary to support the judgment that are supported by the evidence. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). When a

with continuing, exclusive jurisdiction may modify an order that provides for the conservatorship, support, or possession of and access to a child."); *see also id*. § 156.101 (setting forth grounds for modification of order establishing conservatorship or possession and access).

26

reporter's record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising both legal and factual sufficiency of the evidence issues. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). When such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989); *Liberty Mut. Ins. Co. v. Burk*, 295 S.W.3d 771, 777 (Tex. App.—Fort Worth 2009, no pet.). The judgment must be affirmed if it can be upheld on any legal theory that finds support in the record. *Rosemond v. Al–Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011).

When determining issues of conservatorship, possession of, and access to a child, the best interest of the child is the primary consideration. *See* TEX. FAM. CODE § 153.002. The trial court is afforded great discretion when making conservatorship determinations. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Baker v. Baker*, 469 S.W.3d 269, 273 (Tex. App.—Houston [14th Dist.] 2015, no pet.). The trial court is in the best position to determine what will be in the best interest of a child, since the trial court faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent. *Martinez v. Molinar*, 953 S.W.2d 399, 403 (Tex. App.—El Paso 1997, no writ); *Altamirano v. Altamirano*, 591 S.W.2d 336, 338 (Tex. App.—Corpus Christi–Edinburg 1979, no writ); *see also Echols v. Olivarez*, 85 S.W.3d

475, 477 (Tex. App.—Austin 2002, no pet.) ("The trial court is in the best position to observe the demeanor and personalities of the witnesses and can 'feel' the forces, powers, and influences that cannot be discerned by merely reading the record.").

The law presumes that the appointment of both parents as joint managing conservators is in the best interest of the child. *See* TEX. FAM. CODE § 153.131(b). However, a "finding of a history of family violence involving the parents of a child removes the presumption under this subsection." *See id.* In addition, the trial court may not appoint the parents as joint managing conservators if credible evidence is presented of a history or pattern of physical abuse by one parent directed against the other parent or a child. *Id.* § 153.004(b). It is for the trial court to determine whether such credible evidence was presented. *See Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.).

Family violence is defined as "an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or . . . a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault . . . but does not include defensive measures to protect oneself." TEX. FAM. CODE § 71.004.

When, as here, the trial court is the fact finder, it is the sole judge of the weight and credibility of the evidence; if it does not find credible evidence of a

28

history or pattern of physical abuse, it is not bound by Texas Family Code section 153.004 and may appoint both parents as joint managing conservators. *In re Marriage of Harrison*, 557 S.W.3d 99, 127–28 (Tex. App.—Houston [14th Dist.] 2018, pet. denied); *see also Coleman*, 109 S.W.3d at 111 ("Because the district court obviously did not find the testimony to be credible evidence of a history of sexual abuse, it was not bound by section 153.004(b)."). Because section 153.004 does not define "history" or "pattern," courts use a factual analysis, considering both the number and kinds of acts involved when determining whether the appointment of joint managing conservators is barred. *See Hinojosa v. Hinojosa*, No. 14-11-00989-CV, 2013 WL 1437718, at *4 (Tex. App.—Houston [14th Dist.] Apr. 9, 2013, no pet.) (mem. op.). Although a single incident of physical violence could constitute a history of physical abuse, the trial court also may consider the participants' explanations of what occurred and the amount of time that elapsed since the incident in question in determining whether a history or pattern of abuse is shown. *See Alexander v. Rogers*, 247 S.W.3d 757, 762–63 (Tex. App.—Dallas 2008, no pet.).

**Analysis**

*Constitutional Claims*

Within his second issue, Maged argues that the trial court's finding of family violence "cannot pass constitutional muster under a due process or a void-for-

vagueness analysis," and the trial court's finding is "unconstitutional regardless of what she had in mind when she penned her Opinion Letter."[12]  Maged did not raise constitutional arguments at trial.  Thus, this argument has not been preserved for appeal.  *See In re L.M.I.*, 119 S.W.3d at 711; TEX. R. APP. P. 33.1.

### *Sufficiency of the Evidence*

Maged next argues that "[t]here simply was no evidence of any sort to justify the trial court's finding."  Specifically, Maged argues that the evidence of family violence failed to show (1) any evidence of actual physical harm; (2) any intention to cause physical harm; (3) any threats to cause physical harm; and (4) no conduct that a "reasonable person" would construe to be a threat of "imminent physical harm."  Maged contends that the evidence in the record is thus legally and factually insufficient to establish any act of family violence and "certainly not a 'history of family violence.'"  Maged argues that "appellee offered only three incidents during her ten years of marriage to Appellant, and not one of them meets the Texas statutory definition of family violence…."[13]

---

[12]    Maged's reference to the trial court's "Opinion Letter" appears to refer to the trial court's September 26, 2019 letter in which she provided her initial findings.

[13]    Within his second issue, Maged does not provide any argument with citation to authority as to whether the evidence presented during trial constituted family violence.  *See* TEX. R. APP. P. 38.1(i).  Nor does he provide authority in support of his argument that the evidence is insufficient to support a finding of family violence.  *See id*.  Maged does assert a number of evidentiary objections to the trial evidence, but these objections were not raised at trial and thus are waived.  *See* TEX. R. APP. P. 33.1.

30

The record reflects that the trial court heard evidence that, in 2015, Viola experienced an incident of violence by Maged, while the children were in the home, which resulted in Maged's arrest for assault and the imposition of a restraining and protective order that prevented Maged from having any direct contact with her at all. Viola also recalled a 2018 incident in which A.G. found food that Maged had hidden, Maged lost control, hit A.G., and pushed her to the ground. When A.G. stood up for herself, Viola testified that Maged hit her on the back with a plastic stick. Because of this incident, a pediatrician treated A.G. for wrist pain and scratches to her back.

The medical records from that visit provided that "patient stated that her father was angry at her and grabbed her hard by the wrists and pushed her to the ground. He also hit her on the back." The doctor also noted that "[a]ggression and anger [were] apparently common occurrences at home, though this episode became more aggressive," A.G. was a victim of child abuse, a CPS report was filed, and Viola was instructed to call law enforcement if she believed that she or her family was in danger.

During her testimony, Viola repeatedly testified that Maged had anger issues, a history of domestic violence against her and the kids, and abusive and manipulative tendencies. Viola further testified that Maged pushed the kids against the furniture and yelled and screamed. She also recalled an incident in

which C.G. was pushed against a glass, wood, and steel table that caused scratches to his back which resulted in Viola calling the police. The police report confirmed that C.G. received an abrasion on his back from the impact with the table.

When Maged asked if she filed for divorce because of adultery, Viola stated, "I didn't file for divorce because you committed adultery. I filed for divorce because you were violent with the kids and for domestic violence" and "I filed for divorce because you had issues with anger and with domestic violence. I was scared for my kids, and that was the reason. That was the main reason for me filing for divorce." Viola further testified that Maged hit the kids and had no control over his anger.

In contrast to Viola's evidence, Maged testified that Viola was lying, that he did not push A.G. and he denied hurting his daughter. Maged testified that the incident between Viola and him was not violent but admitted that she called the police. He testified, "I'm not abuser. I'm not violent. I'm decent dad. I'm not perfect, but I'm not crazy like the way she described me. I'm not crazy. I'm not violent. I don't hurt my kids. I love them. I give them everything."

Here, the trial court heard Viola's testimony of Maged's violence against herself and her kids along with multiple incidents of Maged's violent behavior that resulted in calls to the police and a CPS referral. The trial court also heard Maged's testimony denying that he was a violent man, disputing that he hurt his

children, and alleging that Viola lied during the trial. The trial court is the sole judge of the weight and credibility of the evidence. *See In re Marriage of Harrison*, 557 S.W.3d at 130. When the parties offer conflicting evidence, the fact finder is permitted to reject one party's version. *See Alexander*, 247 S.W.3d at 764; *see also In re L.G.K.S.*, No. 12-18-00178-CV, 2019 WL 4462693, at *5 (Tex. App.—Tyler Sept. 18, 2019, no pet.) (mem. op.) ("In its role as factfinder, the trial court was entitled to choose which account to believe and could have reasonably credited [one parent's] version of events."). Further, because the record contains no findings of fact and conclusions of law, it is implicit in the trial court's judgment that it found that there was credible evidence of a history or pattern of physical abuse by Maged.[14]

From our review of the record, sufficient evidence supported the trial court's finding of a history or pattern of family violence. *See In re L.C.L.*, 396 S.W.3d 712, 717 (Tex. App.—Dallas 2013, no pet.) (concluding that family violence finding supported by evidence that child was pulled by lips, scratched on back and directed by chin aggressively); *see also Baker*, 469 S.W.3d at 274 (holding that

---

[14] Maged argues in his brief that "Judge Dusek failed to identify even a single incident of misconduct to support her conclusory opinion. Thus we have no way to determine if Judge Dusek believed a *single*, isolated, remote incident led to her conclusion about a 'history' of family violence, or whether she identified *several* episodes of violent misconduct that prompted her to see a 'history' of family violence." Although Maged appears to complain about the trial court's lack of findings, we note that Maged could have requested findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296; TEX. FAM. CODE § 153.258. The record does not show that Maged made this request.

punching wife was sufficient act of family violence). We thus hold that the trial court did not abuse its discretion in finding a history of family violence.

We overrule Maged's second issue.

## Conclusion

We affirm the trial court's divorce decree.

                                        Sherry Radack
                                        Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Farris.